AO 91 (Rev. 11/11)  Criminal Complaint

FILED

Jun 25 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

for the

Northern District of California

United States of America
v.

Yuance CHEN
and
Liren LAI a/k/a "Ryan" Lai

Case No.  3:25-mj-70788-AGT

**4:25-mj-0404**

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 2021 through April 2025___ in the county of ___Alameda and elsewhere___ in the
___Northern___ District of ___California & elsewhere___ , the defendant(s) violated:

| _Code Section_ | _Offense Description_ |
|---|---|
| 18 U.S.C. § 951 | Acting as an Agent of a Foreign Government Without Notice to the Attorney General of the United States |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Jacklyn Enger.

☑ Continued on the attached sheet.

Approved as to form _____
AUSAs Gilbert and Cheng

s/Jacklyn Enger (sworn via telephone)
_Complainant's signature_

Jacklyn Enger, FBI Special Agent
_Printed name and title_

Sworn to before me by telephone.

Date: __6/25/25__

_Judge's signature_

City and state:  ___San Francisco, California___

Hon. Alex G. Tse, U.S. Magistrate Judge
_Printed name and title_

1    I, Jacklyn Enger, a Special Agent with the Federal Bureau of Investigation ("FBI") in

2 Portland, Oregon, being first duly sworn, hereby depose and state the following:

3 **I.    PURPOSE OF AFFIDAVIT AND CRIMINAL CHARGE**

4    1.    I submit this affidavit in support of a Criminal Complaint that charges Yuance Chen

5 ("YUANCE") and Liren "Ryan" LAI ("LAI") with Acting as Agents of a Foreign Government

6 Without Notification to the Attorney General.

7    2.    Specifically, from at least as early as in or about May 2021 up to and including in or

8 about April 2025, in the Northern District of California and elsewhere, YUANCE and LAI acted

9 within the United States under the direction and control of the Government of the People's Republic

10 of China ("PRC"), without prior notification to the Attorney General, as required by law, in violation

11 of 18 U.S.C. § 951.

12 **II.    AGENT QUALIFICATIONS**

13    3.    I am a Special Agent ("SA") with the FBI, and have been since March 2020. I am

14 currently assigned to a Counterintelligence Squad in the Portland Field Office of the FBI. In my

15 capacity as an SA, I have received training in, and my duties include the investigation of, violations

16 of federal criminal law, including matters related to acting as an illegal agent of a foreign

17 government, espionage, and counterintelligence-related offenses.

18    4.    The facts in this Affidavit come from my personal observations; my training and

19 experience; my review of documents and other records; and information obtained from other agents,

20 law enforcement personnel, and witnesses.

21    5.    Unless otherwise noted, wherever in this Affidavit I recount a statement, including

22 written statements made by another person, that statement is recounted in substance and in relevant

23 part. Statements originally in English or a foreign language in quotation marks, if any, are based on

24 preliminary translations or transcriptions, and review of or interpretations of communications, all of

25 which may be subject to revision. Unless otherwise stated, all dates and times listed in this Affidavit

26 are Pacific Time and are approximate.

27 //

28
AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                                                1

6.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

III.    **SUMMARY OF PROBABLE CAUSE**

7.    The defendant Yuance Chen ("YUANCE") is a PRC citizen who arrived in the United States on or about September 2015 on a B1/B2 visitor visa.  YUANCE was granted conditional permanent resident status after United States Citizenship and Immigration Services ("USCIS") recognized his marriage to Associate #1, an individual whose identity is known to me, on or about June 26, 2019.  YUANCE was granted lawful permanent resident ("LPR") status on or about December 19, 2022.  YUANCE and Associate #1 currently reside in Happy Valley, Oregon.

8.    The defendant Liren "Ryan" LAI is a PRC citizen who resides in the PRC.  He recently arrived in the United States via Houston, Texas on or about April 1, 2025, on a B1/B2 visitor visa.  According to his visa application, LAI is employed at a warehouse management, strategic planning, and personnel management company based in the PRC.

9.    As described in further detail below, I have probable cause to believe that since at least as early as May 2021, up to and including April 2025, the PRC's Ministry of State Security ("MSS"), defined below, has directed YUANCE and LAI to oversee and/or carry out various clandestine operations in the United States, including facilitating a "dead drop"[1] payment of cash on behalf of the MSS, gathering intelligence about U.S. Navy service members and bases, and assisting with efforts to recruit other potential MSS assets from within the U.S. military.

10.    According to Department of Justice database checks in June 2025, neither YUANCE nor LAI have ever notified the Attorney General under 18 U.S.C. § 951 that they were acting as agents of a foreign government.

---

[1] A "dead drop" is a method of tradecraft used to pass items or information between two individuals using a secret location, thus not requiring them to meet directly so as to maintain operational security.

AFFIDAVIT OF FBI SA JACKLYN A. ENGER

2

1    IV.    **STATEMENT OF PROBABLE CAUSE**

2         A.    BACKGROUND ON 18 U.S.C. § 951

3         11.    Title 18, United States Code, Section 951 provides that "[w]hoever, other than a

4    diplomatic or consular officer or attaché, acts in the United States as an agent of a foreign government

5    without prior notification to the Attorney General if required," shall be punished. With several

6    exceptions not applicable here, Section 951 defines the term "agent of a foreign government" as "an

7    individual who agrees to operate within the United States subject to the direction or control of a

8    foreign government or official." 18 U.S.C. § 951(d).

9         B.    BACKGROUND CONCERNING THE MINISTRY OF STATE SECURITY

10        12.    The Government of the PRC conducts intelligence activities using a variety of sources,

11   including through its Ministry of State Security ("MSS"). The MSS handles civilian intelligence

12   collection for the PRC and is responsible for counterintelligence and foreign intelligence, as well as

13   political security. The MSS consists of a central ministry, provincial state security departments, and

14   municipal state security bureaus. Collectively, the MSS has broad powers in the PRC to conduct

15   espionage both domestically and abroad.

16        13.    Among other things, the MSS and its regional bureaus focus on identifying and

17   influencing the foreign policy of other countries, including the United States. The MSS and its

18   bureaus seek to obtain information on political, economic, and security policies that might affect the

19   PRC, along with military, scientific, and technical information of value to the PRC. The MSS and its

20   bureaus are tasked with conducting clandestine and covert human source operations, of which the

21   United States is a principal target.

22        14.    The U.S. Government has been investigating the activities of the MSS targeting the

23   United States. As part of such investigation, the FBI has obtained communications sent by MSS

24   intelligence officers to an individual known to the MSS as a former government employee located in

25   the United States (whose identity is known to me, and who is identified herein as "Individual A"), in

26   order to, among other things, coordinate cash payments in exchange for information relating to the

27   national security of the United States previously provided to the MSS.

28

AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                                          3

15.    The MSS has communicated with Individual A using email and covert communication ("COVCOM")[2] tools provided by the MSS, which allowed for real-time two-way communication. The MSS typically used email communications to discuss less sensitive matters, such as scheduling COVCOM communications and operational activity. The MSS used the COVCOM tool to engage in more sensitive communications. In the course of this investigation, I believe COVCOM transmissions have replaced some in-person meetings due primarily to the reliability, timeliness, and operational security offered by the tool. Further, based on my training and experience, MSS intelligence officers based in the PRC did not travel to the United States due to operational risk and instead relied on a network of "co-optees"[3] who could travel more easily between the PRC and the United States to facilitate clandestine operations.

C.    IDENTIFICATION OF MSS CO-OPTEE WHO HAS TRAVELED TO THE UNITED STATES TO CONDUCT MSS OPERATIONS

16.    In the course of this investigation, I have identified an individual whose identity is known to me (referred to herein as "MSS CO-OPTEE"), who I believe is an agent and high-level co-optee of the MSS. Since as early as in or about June 2015 up to and including September 2023, MSS CO-OPTEE has carried out various clandestine operations in the United States on behalf of the MSS directly related to the MSS's communications with Individual A. Specifically, MSS CO-OPTEE has traveled to the United States to deliver payments on behalf of the MSS, test and trouble-shoot MSS COVCOM systems, retrieve information on behalf of the MSS, and also, from abroad, enlist other individuals in the United States to facilitate payments on behalf of the MSS. For the reasons explained in the following paragraphs, I believe that MSS CO-OPTEE is controlled by MSS intelligence officers, who are also communicating with Individual A.

17.    For example, on February 15, 2017, the MSS emailed Individual A and indicated that in March, an individual would travel to the United States to provide a $30,000 payment. Between

---

[2] The term "COVCOM" refers to any impersonal communication between an intelligence service and an asset or developmental that uses a proprietary system.

[3] A "co-optee" is a person not officially employed by an intelligence agency of a country who has agreed to conduct operations or otherwise collaborate with such an agency.

February 27, 2017, and March 6, 2017, the MSS confirmed, by email, that this individual would meet Individual A on March 14, 2017. On March 13, 2017, MSS CO-OPTEE flew into the United States to San Francisco International Airport ("SFO"). FBI surveillance observed he was met by PERSON #1, a San Francisco-based individual whose identify is known to me. On March 14, 2017, the FBI observed MSS CO-OPTEE briefly meet with an individual in Sausalito. PERSON #1 drove MSS CO-OPTEE to the meeting.

18.    PERSON #1's bank account records show that PERSON #1 received an incoming wire transfer on March 8, 2017, in the amount of $30,000, from MSS CO-OPTEE. Based on my training, experience, and familiarity with this investigation, I believe that this wire transfer from MSS CO-OPTEE was intended as the payment the MSS told Individual A would be delivered on March 14, 2017, on behalf of the MSS, and the wire transfer from MSS CO-OPTEE to PERSON #1 was a way to move these funds into the United States from abroad.

19.    The FBI reviewed MSS CO-OPTEE's B1/B2 visitor visa application, which was issued on March 25, 2014, and expired on March 23, 2024. On this application, MSS CO-OPTEE identified his employer and listed the employer's U.S. contact information as an address in Toledo, Ohio and a telephone number ending in -2700. An individual whose true name is known to me and who I believe to be an MSS officer (hereinafter "MSS OFFICER 1") for the reasons explained below, also submitted B1/B2 visitor visa applications, in July 2011 and again in July 2013, that listed what appeared to be the same employer and U.S. contact information as MSS CO-OPTEE's 2014 visa application, with the same U.S. contact address in Toledo, Ohio, and the same telephone number ending in -2700. MSS OFFICER 1's July 2013 visa application also listed a telephone number ending in -2310.

20.    Through legal process, I have obtained MSS CO-OPTEE's phone contacts list. Eleven contact entries included two Chinese characters that were translated by an FBI certified linguist to mean "Ministry of State Security." Based on my training, experience, and knowledge of this operation, I believe this is a reference to the MSS. Of the eleven contacts that were specifically labeled as "Ministry of State Security," one was for MSS OFFICER 1. MSS CO-OPTEE's entry for

1  MSS OFFICER 1 was "Section Head [MSS OFFICER 1's surname], Ministry of State Security,"

2  with a telephone number ending in -2310.  This was the same phone number listed on MSS

3  OFFICER's July 2013 U.S. visa application. The modified date for MSS OFFICER 1's contact

4  information in MSS CO-OPTEE's contacts was listed as March 10, 2017, just a few days before MSS

5  CO-OPTEE traveled to the United States on March 13, 2017, after the MSS arranged to make a

6  payment to Individual A.  Additionally, on or about March 17, 2017, while MSS CO-OPTEE was

7  still in the United States following his meeting in Sausalito, MSS CO-OPTEE exchanged text

8  messages with the phone number ending in -2310, which based on the information above, I believe

9  was being used by MSS OFFICER 1.  MSS OFFICER 1 asked MSS CO-OPTEE to contact MSS

10  OFFICER 1 when he arrived home.

11      21.    Additionally, in 2015 and 2017, MSS CO-OPTEE traveled to the United States with

12  another individual, whose identity is also known to me, following failures of the COVCOM tool

13  during transmissions by Individual A of information to the MSS.  I believe that MSS CO-OPTEE was

14  sent by the MSS to test and fix the COVCOM tool for both of these trips.

15      22.    During one of these trips in June 2015, MSS CO-OPTEE was observed by FBI

16  surveillance purchasing a new SIM card and laptop computer.  Twice during this trip, on June 30,

17  2015 and July 5, 2015, MSS CO-OPTEE called MSS OFFICER 1's number ending in -2310 using a

18  mobile phone associated with the new SIM card.  On June 30, 2015, while MSS CO-OPTEE was still

19  in the United States, MSS OFFICER 1 texted a single Chinese character, "wei," to MSS CO-OPTEE,

20  which based on my training and experience I believe was a direction to go onto a Chinese messaging

21  application to continue the conversation.  On July 2, 2015, the MSS communicated with Individual A

22  that it was ready for the next COVCOM transmission and later instructed Individual A to purchase a

23  new specific laptop model identical to the one purchased by MSS CO-OPTEE in the United States in

24  June 2015.  On July 5, 2015, MSS CO-OPTEE left the United States, returning to Hong Kong, PRC.

25      23.    Therefore, there is probable cause that Individual A was communicating with the

26  MSS, and that the MSS, specifically MSS OFFICER 1, was controlling MSS CO-OPTEE.

27  //

28

AFFIDAVIT OF FBI SA JACKLYN A. ENGER

6

D.   LAI RECRUITED YUANCE ON BEHALF OF THE MSS

24.   Based on my knowledge of this investigation, training, experience, and the subsequent events and communications described below, there is probable cause to believe that LAI was an agent and high-level co-optee of the MSS, going by the moniker "Ryan."  Since at least as early as 2021, there is probable cause to believe that LAI (as "Ryan") communicated with YUANCE through a PRC-based messaging application, and served as a conduit between YUANCE and the MSS, including as described in the messages between LAI and YUANCE referenced in this Affidavit.  In particular, based on communications between LAI and YUANCE, LAI appears to have been developing YUANCE as an asset for the MSS since at least mid-2021.  These communications, as well as all other communications described in this Affidavit unless otherwise noted, were in Chinese and English.  I have reviewed preliminary and summary translations of the communications in Chinese described herein that were prepared by an FBI certified linguist.

25.   Specifically, on or around May 4, 2021, LAI asked YUANCE if he had "join[ed] the military [in the U.S.]" and YUANCE explained that he knew individuals in "in all three, sea, land, and air."  Based on my knowledge of this investigation, training, and experience, I believe that YUANCE was referring to knowing individuals in the U.S. Navy, Army, and Air Force.  Later in the exchange, LAI asked YUANCE if he was a reservist and whether YUANCE had any "base[s] near your area."  In July 2021, LAI asked YUANCE to find time to go to Macau or China as LAI had something he wanted to discuss in-person with YUANCE; LAI asked YUANCE to "confirm a time, seriously" and offered to pay for the airfare and buy the ticket for YUANCE.  In August 2021, LAI told YUANCE to submit a "feasibility report", and YUANCE responded that he had already submitted the status and background.  LAI explained to YUANCE that when he is "really doing it" he would have to come back to see "our boss" as a "big project demands cautiousness," telling YUANCE to "write what you can."  I believe based on my training, experience, and familiarity with this investigation that these conversations show LAI developing YUANCE as a potential asset for the MSS.

//

AFFIDAVIT OF FBI SA JACKLYN A. ENGER

7

26.    On or around November 12, 2021, YUANCE traveled to the Guangdong Province of the PRC from Los Angeles, California, and stayed until on or about January 13, 2022.  On or about December 20, 2021, while YUANCE was still in the PRC, LAI wrote to YUANCE, "Chief [MSS OFFICER 1's surname][4] is back."  Based on my knowledge of this investigation, my training and experience, as well as subsequent events and communications described below, I believe the individual referred to as "Chief" by LAI is the same individual who directed MSS CO-OPTEE's actions described above.  As discussed in further detail below, YUANCE and Associate #1 met with an individual identified in messages as "Chief [MSS OFFICER 1's surname]," as well as other individuals I believe to be MSS intelligence officers, in Guangzhou, Guangdong Province, PRC, during an in-person meeting in April 2024 (*see* Paragraphs 87–94 below).

E.    <u>YUANCE AND LAI FACILITATED A DEAD DROP PAYMENT IN THE UNITED STATES FOR THE MSS IN JANUARY 2022</u>

27.    As described in more detail below, on or about January 12, 2022, YUANCE and LAI, who were both in the PRC at the time, coordinated on directing Associate #1 and a second individual, whose identity is known to me ("Associate #2"), to conduct a dead drop by leaving a backpack containing at least $10,000 in cash, intended as payment by the MSS to an individual located in the United States, in a day-use locker at a recreational facility in Livermore, California.  During the same time frame, YUANCE also received instructions about the dead drop from and provided information about the dead drop to other unidentified individuals I believe were agents (either intelligence officers or high-level co-optees) of the MSS.  As described in further detail below, YUANCE provided instructions to, and received updates from, Associate #1 in real time related to the dead drop.

28.    Specifically, during a COVCOM transmission between the MSS and Individual A on or around July 7, 2021, the MSS acknowledged that they owed Individual A $10,000.  This conversation was in English.  The MSS stated that payment could be made one of two ways.  The first option was to have "reliable friends" deposit money via ATM into the bank account of a trusted individual and who would not question the source of the funds.  Alternatively, the MSS explained

---

[4] LAI's message used MSS OFFICER 1's surname, which is known to the FBI.

that the other option was the "old way, I ask reliable friend put money into some storage box of theater, fitness room or somewhere have not camera, and you come to pick it up." Based on my training and experience, I believe that the MSS was describing a "dead drop," as defined in footnote 1 above. Individual A agreed this was a safer method and that they would look around for a suitable location for receiving payment in this manner. The MSS agreed to add "a few thousand" to the amount owed Individual A.

29. On or around August 6, 2021, the MSS agreed to deliver the dead drop to a specific recreational facility located in Dublin, California (hereinafter "Location A") with day-use lockers, but stated that it would take several months before the payment could be made. On December 21, 2021, the MSS confirmed via email to Individual A that the "exchange" would happen on January 12, 2022.

30. On January 8, 2022, LAI asked YUANCE in a message, "How much would it cost on your side? Would $500 be enough to cover the cost when I send you $3000? This is for salary." I believe, based on my training and experience, as well as my familiarity with this investigation, including communications in the following days between LAI and YUANCE, that LAI was tasking YUANCE with coordinating this dead drop payment on behalf of the MSS and asking how much it would cost. YUANCE did not respond to this message immediately but confirmed with LAI that he would meet LAI for lunch around 11:30 AM on January 10, 2022, at a specific hotel, which is located in Guangzhou, Guangdong Province, PRC. On January 10, 2022, YUANCE sent Associate #1 an image that appeared to be a photograph of a piece of paper containing an image of Location A, with Location A's address handwritten on the paper, along with another photograph and map view of Location A.

31. On January 11, 2022, Associate #1 asked YUANCE "what is the budget" and YUANCE replied, "Expenses are filed as usual, salary is 1,500."

32. On January 11, 2022, LAI and YUANCE discussed details and logistics for the dead drop to occur the next day. LAI asked YUANCE, "Is the arrangement ready?" and YUANCE responded that he was coordinating to have two individuals travel on the evening January 11 or the morning of January 12. LAI also referenced other people who he was reporting to about the plan, as

he told YUANCE, "I'll tell them about your plan" and "[y]es, make sure it is done right. -_-‖ are looking at us." YUANCE acknowledged to LAI that this was an "[i]mportant mission with time constraint." I believe, based on my training, experience, and familiarity with this investigation, that LAI was referring to reporting to the MSS about YUANCE's plan for getting couriers to the San Francisco Bay Area to execute the dead drop for the MSS.

33.     Later that day, YUANCE and LAI continued to communicate about the logistics of the dead-drop—which LAI referred to as a "major project assigned by the boss." LAI also warned YUANCE that, "[m]essing this up, promotion [or] year-end bonus will be missing." I believe based on my training, experience, and familiarity with this investigation, including reviewing communications between YUANCE and LAI, that LAI's reference to "the boss" was to MSS officials. When LAI told YUANCE, "Messing this up, promotion [or] year-end bonus will be missing," I believe that LAI was asserting influence and control over the operation by telling YUANCE that either YUANCE or LAI would not receive a promotion or a bonus from the MSS if the dead drop did not happen successfully. YUANCE indicated to LAI that he would be arriving in Guangzhou the evening of January 11, 2022, and later confirmed that he had arrived at a specific hotel located in Guangzhou, Guangdong Province, PRC.

34.     Also on January 11, 2022, at approximately 8:27 PM PT, YUANCE and Associate #1 communicated about Associate #1's upcoming trip to the San Francisco Bay Area in text messages and Push-To-Talk messages.[5] During the conversation, YUANCE urged Associate #1 to buy plane tickets from Portland to San Francisco. They also discussed how to transport cash, including how to package the money in a "paper bag" and then into a "backpack" that would be placed "into the locker." At one point in the conversation, YUANCE stated that he would "report" information Associate #1 gathered about the lockers at two different recreational facility locations to "them," which I believe based on my training, experience, and familiarity with this investigation, to be a

---

[5] Push-To-Talk is an option in a PRC-based messaging app where a user can send a recorded voice message in a text message conversation. Preliminary translations of Push-To-Talk communications in this affidavit are marked "PTT."

reference to the MSS. At the end of the conversation, Associate #1 confirmed to YUANCE that she "[w]ent and bought" the plane tickets.

35.    On the morning of January 12, 2022, Associate #1 and Associate #2 flew from Portland International Airport ("PDX") to San Francisco International Airport ("SFO"). Associate #2 rented a black sedan at SFO around 10:59 AM PT.

36.    That morning, prior to the flight, YUANCE gave Associate #1 additional directions, telling her to, "[t]ake a photo of it when the time comes, they said they need to see what packaging it is," which I believe to mean he wanted Associate #1 to take a photograph of the cash for the dead drop. Further, I believe that YUANCE's reference to "they" is a reference to the MSS.

37.    After Associate #1 and Associate #2 arrived in San Francisco, Associate #1 sent YUANCE the following photographs of cash and the backpack it was to be packaged in, at approximately 11:10 AM and 11:11 AM Pacific Time, respectively:



38.    Throughout the day of January 12, 2022, YUANCE and Associate #1 continued to exchange a series of messages in which they discussed alternative dead-drop locations and YUANCE directed Associate #1 to find potential locations with lockers near Dublin, California. For example, at 11:32 AM Pacific Time (approximately 3:32 AM in Guangzhou), YUANCE wrote, "Search around

Dublin to see if there is any chain store location of this one [a bowling alley], if there is, I will wake them up right away." At approximately 12:30 PM Pacific Time, Associate #1 sent YUANCE a series of photographs of lockers that appeared to be from a bowling alley, some of which show lockers that use keys, and some which used combination locks, and commented that "[t]here are some that use combinations," to which YUANCE replied, "nice." YUANCE then messaged Associate #1, "[g]o over to that [recreational facility] and check out the surrounding. After that, is free time. Wait for the next notification/instruction. I am going to wake them up first." YUANCE also encouraged Associate #1 to "eat better food, you will get reimbursed."

39.    Surveillance footage acquired from Location A showed Associate #1 and Associate #2 enter Location A at timestamp "13:28 PM," which is believed to be 12:28 PM PT,[6] then proceed to the mobile device charging lockers station. The photograph below is a still image of this surveillance footage with a markup showing a red circle around Associate #1, wearing black, and Associate #2, wearing a white and gray plaid shirt, at the charging lockers station[7]:



---

[6] I believe that the surveillance footage was not adjusted for Pacific Standard Time and the system was capturing times in Pacific Daylight Time.

[7] Markings have been applied to this image to obscure information tending to identify the location of this recreational facility.

40.    At approximately 12:39 PM PT, Associate #1 informed YUANCE that the lockers were full at Location A.  YUANCE instructed Associate #1 to look for more recreational locations nearby.

41.    I believe based on my training, experience, and familiarity with this investigation, that Associate #1 was looking for lockers with combination locks.  Based on my training and experience, foreign intelligence services, including the MSS, often use combination lockers for operational security when conducting dead drops so participants are able to share access to the dead drop contents without in-person contact and to minimize the risk of misplacing lock keys in transit.  I further believe that when YUANCE told Associate #1, "I will wake them up right away" and "I am going to wake them up first," YUANCE meant that he would wake up the MSS officials in order to discuss YUANCE and Associate #1's plan.  I also believe that the references to reimbursement meant that MSS would reimburse both YUANCE and Associate #1 for their expenses during the dead drop operation.

42.    In sum, based on the timeline of the conversations between YUANCE and LAI, and YUANCE and Associate #1, I believe that the MSS directed YUANCE to use a United States-based courier—YUANCE's wife, Associate #1—to facilitate the dead drop.  I also believe that YUANCE directed Associate #1 to procure at least $10,000 in cash, travel from the Portland, Oregon area to the San Francisco, California area, and scout out locations for the dead drop.  I also believe that YUANCE traveled to Guangzhou, at least in part, so that he could communicate in-person with agents of the MSS.  Based on my training and experience with counterintelligence investigations, I believe that the MSS's in-person communications with YUANCE during the dead drop were likely designed to enhance the operational security of the dead drop, so that YUANCE could provide real-time updates to the MSS and facilitate instructions between the MSS and Associate #1.  Finally, I believe that Associate #1 and YUANCE were being reimbursed by the MSS for their expenses during this time, and that YUANCE understood he would also receive a salary payment for the dead drop.

43.    At approximately 1:39 PM PT, Associate #1 sent YUANCE the address of a different recreational facility with day-use lockers located in Livermore, California (hereinafter "Location B") and the following image of Location B:[8]



44.    At approximately 1:40 PM PT (approximately 5:40 AM in Guangzhou), YUANCE said, "Ok! I will wake the guys up." I believe, based on my training, experience, and familiarity with this investigation, that by "the guys," YUANCE likely meant MSS intelligence officers.

45.    At approximately 2:00 PM PT, the MSS communicated to Individual A via COVCOM that a payment would be delivered via dead drop at Location B at approximately 4:00 PM. At approximately 3:40 PM PT, FBI surveillance observed two unidentified Asian females, later identified as Associate #1 and Associate #2, enter the Location B parking lot in a black sedan with major body damage and a license plate that matched the vehicle rented by Associate #2 at SFO that morning.[9] The two females entered Location B and eventually started bowling. Shortly thereafter,

---

[8] The name and address of Location B are obscured in this image, but were not obscured in the image sent from Associate #1 to YUANCE.

[9] Rental company records confirmed Associate #2 requested and received a replacement rental vehicle at Location B due to the vehicle's body damage. According to rental company records and FBI surveillance, the replacement vehicle was returned to San Francisco International Airport the next day when Associate #1 and Associate #2 departed San Francisco.

FBI surveillance observed them place a backpack inside a locker located inside Location B. One of the females also took a photograph of the locker with a cell phone.

46.    At approximately 3:45 PM, Associate #1 and YUANCE engaged in the following conversation. The date and times are Pacific Time:

| Date/Time (PT) | Sender | Message |
|---|---|---|
| 1/12/2022 3:45 PM | Associate #1 | #8 |
| 1/12/2022 3:46 PM | Associate #1 | 9-23-45 |
| 1/12/2022 3:47 PM | Associate #1 |  |
| 1/12/2022 3:47 PM | Associate #1 |  |
| 1/12/2022 3:48 PM | YUANCE | Let's just go |
| | | . . . |

| Date/Time (PT) | Sender | Message |
|---|---|---|
| 1/12/2022 3:53 PM | Associate #1 | [PTT in Chinese] It will be fast. You mentioned 4 o'clock. Would [he/she] be early or late? Would it be early? |
| 1/12/2022 3:53 PM | YUANCE | [PTT in Chinese] When it is not open [closed], [you] remember how to turn it? I am afraid you do not know how to open it. |
| 1/12/2022 3:54 PM | Associate #1 | 9/23/45 |
| 1/12/2022 3:54 PM | Associate #1 | [PTT in Chinese] After reaching 9, then spin to the right to 23 followed by 45. |
| 1/12/2022 3:54 PM | YUANCE | [PTT in Chinese] You may leave now. |

47.    I believe based on my training, experience, and familiarity with this investigation that Associate #1 sent YUANCE the locker number, "#8," the locker combination, "9/23/45," details about how to open the combination lock, and a photograph of the locker where she had left the backpack containing the cash.

48.    Surveillance footage acquired from Location B shows Associate #1 and Associate #2 enter Location B around 3:48 PM PT. Associate #1 was carrying a black backpack and she entered the locker area around 3:50 PM PT and appeared to be taking a photo of the locker area around 3:53 PM PT. At approximately 3:54 PM PT, Associate #1 and Associate #2 departed, and Associate #1 was no longer carrying a backpack.

49.    At approximately 4:00 PM PT, the MSS instructed Individual A via COVCOM to retrieve "the package" from locker number 8 using combination "9-23-45." At approximately 4:15 PM PT, FBI employees observed Associate #1 and Associate #2 exit Location B. At approximately 4:18 PM PT, Associate #1 messaged YUANCE, "Leaving, not dealing with it any more, tell him to hurry up and get it/pick it up." YUANCE responded at approximately 4:18 PM PT, "waiting for the reply from the other side."

50.    On January 12, 2022, between approximately 6:27 AM PT and 1:09 PM PT (January 12, 2022 at 10:27 PM CST to January 13, 2022 at 5:09 AM CST, where YUANCE was located), there appear to be no messages between LAI and YUANCE. On January 12, 2022, at approximately 1:09 PM PT (January 13, 2022, at 5:09 AM in CST), YUANCE sent LAI a message stating, "he/she will have a long report to write." On January 12, 2022, at approximately 3:19 PM PT (January 13,

1  2022 at approximately 7:19 AM in CST), LAI responded to YUANCE, "What's up?  Good news or

2  bad news?"  LAI wrote shortly thereafter at 3:24 PM PT (January 13, 2022, at 7:24 AM in CST),

3  "What's up?"  YUANCE did not respond to LAI until approximately 4 hours later, at 7:31 PM PT

4  (January 13, 2022, at 11:31 AM in CST), when YUANCE said to LAI, "Can you ask [if I] can get the

5  money today?"  I believe based on my training, experience, and familiarity with this investigation that

6  the gap in communication between YUANCE and LAI occurred overnight in the PRC, and that

7  instead of communicating with LAI about the dead drop, YUANCE communicated with other

8  members or affiliates of the MSS, either in person or using a different communication method, as

9  indicated by YUANCE's statements to Associate #1 above that he would wake people up.

10  Furthermore, I believe that LAI checked in with YUANCE the next morning to ask about the status

11  of the dead drop, and that YUANCE's response was requesting payment from the MSS for

12  facilitating the dead drop.

13        51.      Associate #1 and Associate #2 departed from SFO on January 13, 2022, to PDX.

14  YUANCE returned to the United States on January 13, 2022, flying from Baiyun ("CAN"),

15  Guangdong Province, PRC to Los Angeles International Airport ("LAX").

16        52.      Based on the timeline of messages and events above, I believe that YUANCE was

17  communicating information he was receiving from Associate #1 back to LAI and the MSS

18  intelligence officers in real-time so that that the MSS could issue instructions on how to retrieve the

19  dead-drop.

20

21  F.    LAI AND MSS OFFICERS TASKED YUANCE WITH OBTAINING
       INFORMATION ABOUT THE U.S. NAVY

22        53.      Between April 2022 and April 2025, YUANCE and LAI, at the direction of MSS

23  intelligence officers, continued to act as agents of the PRC government.  Specifically, YUANCE

24  collected information about the U.S. Navy with the assistance of Associate #1 and is believed to have

25  sent it back to LAI, in order to be provided to the MSS.  YUANCE and a suspected MSS intelligence

26  officer also discussed recruiting U.S. Navy employees to work for the MSS.  And YUANCE met with

27  a member of the U.S. Navy and likely discussed this individual with the MSS.

28

AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                              17

54.    I know based on my training and experience that the MSS has and continues to actively target and collect non-publicly available information about the U.S. military, including the U.S. Navy. The PRC government seeks blue-water naval capabilities as part of their effort to modernize their navy and establish hegemony in the South China Sea region. The PRC government also seeks to collect intelligence on adversary military targets, particularly the U.S. military, in order to better be prepared for and equipped to handle any adversarial military actions including kinetic warfare. As such, the PRC government tasks and deploys the MSS to surreptitiously target the U.S. Navy and collect intelligence to inform PRC government policymakers and military planners.

       *1.   In May 2022, YUANCE and Associate #1 Took Photographs of a Navy Base and YUANCE Likely Sent Them to the MSS*

55.    On or around April 27, 2022, LAI asked YUANCE when he was going to Seattle. YUANCE responded "Sunday."[10]

56.    On May 12, 2022, at approximately 11:48 AM PT, YUANCE sent LAI three attachments with file names "5219.pic," "5221.pic," and "5222.pic", along with the message "1: base; 2: military port." The FBI does not have the files that YUANCE sent to LAI. However, based on my training, experience, and familiarity with this investigation, I believe that they were image files, as I know that .pic is a file extension used for image files. I believe that YUANCE may have been describing the two image files that he sent to LAI as depicting a "base" and a "military port."

57.    At approximately 5:34 PM PT, YUANCE messaged Associate #1, stating, "Send me the Seattle pictures." At approximately 5:47 PM PT, Associate #1 then sent YUANCE four photos, one of which included a sign that said "Naval Base Kitsap-Bangor."[11] Three of these four photographs contain metadata indicating that Associate #1 took the photographs and that they were taken throughout the Kitsap Peninsula in Washington, specifically around Navy Base Kitsap.

---

[10]    Sunday would have been approximately May 1, 2022.

[11]    Naval Submarine Base Kitsap-Bangor is located on Navy Base Kitsap (NBK) in Bremerton, Washington, and provides base operating services, including support for both surface ships and submarines homeported at Bremerton and Bangor. NBK is the Navy's third largest fleet concentration area in the United States.

AFFIDAVIT OF FBI SA JACKLYN A. ENGER      18

58.    At approximately 5:49 PM PT, YUANCE sent four more ".pic" files to LAI.  While the FBI does not have access to the actual images sent, based on my training, experience, and familiarity with this investigation, I believe that YUANCE sent LAI the same four photographs taken by Associate #1 and/or YUANCE of U.S. Navy Base Kitsap that Associate #1 had sent to YUANCE minutes earlier.

        2.    *In July 2022, YUANCE and Associate #1 Took Photographs and Videos of a Navy Recruiting Station and YUANCE Sent These Photographs to LAI*

59.    There is probable cause to believe that LAI directed YUANCE to take photographs at a Naval Recruiting Station in California on behalf of the MSS, and potentially directed YUANCE to specifically take photographs with a Navy employee or recruiter, and that YUANCE sent LAI a video clip that Associate #1 surreptitiously recorded inside the Naval Recruiting Station.  Specifically, on or about June 30, 2022, LAI asked YUANCE if it was possible to take a "joint photo" to which YUANCE affirmed it was.  A few days later, on or about July 2, 2022, LAI repeated his request for a joint picture, and YUANCE explained that he would try in a few days when he "comes out again."  On or about July 8, 2022, Associate #1 took videos inside U.S. Navy Recruiting Station Alhambra (NRS Alhambra), which is located in San Gabriel, California.  The videos, which appeared to be surreptitiously recorded, showed YUANCE and a Navy recruiter walking at NRS Alhambra and discussing the benefits of joining the U.S. Navy in Chinese and English.

60.    On or around July 11, 2022, Associate #1 sent YUANCE these videos.  On or about July 20, 2022, YUANCE sent a file to LAI named "6123.mp4" explaining that he went there the other day.  On or about July 20, 2022, LAI asked YUANCE, "Where is this?" to which YUANCE responded, "their office" and "military."  LAI replied, "You were able to get that!"  YUANCE responds that "you guys" wanted him to get a group picture, but photos are not allowed inside, so the photos were taken in secret.

//

//

//

3. *In March 2023, LAI Traveled to the United States and in April 2023, YUANCE Began Communicating Directly with "Paul," a Likely MSS Intelligence Officer, with LAI's Assistance*

61.   On or around March 27, 2023, LAI traveled to the United States and landed in Seattle, Washington.

62.   On or about April 10, 2023, at 7:46 PM PT, LAI alerted YUANCE that he had inadvertently left a cellphone LAI intended to give to YUANCE in a hired ride share vehicle. LAI explained that he was asking someone to call to bring it back. Shortly after, YUANCE asked LAI, "did it go through?" which I believe was a reference to whether LAI was able to successfully call the ride share driver to retrieve the phone. YUANCE then told LAI that he was "***divulging state secret***" (emphasis added). Less than one hour later, LAI notified YUANCE that he "got the cellphone back" and asked when YUANCE would come to get it. I believe based on my training, experience, and knowledge of this investigation that YUANCE's statement to LAI about "state secret[s]" indicated YUANCE's knowledge that the cellular phone momentarily lost by LAI that was intended for YUANCE was connected to a foreign government.

63.   Approximately one week later, on April 17, 2023, YUANCE and an individual using the moniker with the first name of "Paul" (hereinafter "Paul"), coordinated a time to talk. At approximately 8:31 PM PT, Paul instructed YUANCE to "talk with the cellphone provided by LAI, did you bring it out?" Notably, Paul referenced the true surname of LAI, rather than the "Ryan" moniker, confirming that the person YUANCE was communicating with was LAI given the recent exchange about providing a cell phone to YUANCE. The next day, on April 18, 2023, at approximately 3:59 AM PT, Paul advised YUANCE to "remember the cellphone will not automatically refresh after you turn it off, do not upgrade the software." I believe, based on my training, experience, familiarity with this investigation, and review of these communications, that Paul was an MSS officer, and the MSS tasked LAI to transport a cellphone to the U.S. that would allow the MSS to conduct sensitive communications with YUANCE.

//

//

4.    *In May 2023, YUANCE and Associate #1 Took Additional Photographs and Videos of a Navy Recruiting Station and YUANCE Likely Sent These Photographs to the MSS*

64.    Between late April and early May 2023, YUANCE and Associate #1 again traveled to Southern California and stayed at a hotel located in Alhambra, California, five miles from NRS Alhambra.

65.    On or about May 3, 2023, Associate #1 sent YUANCE seven photographs. The photographs are of bulletin boards, believed to be from inside NRS Alhambra, with the names and photos of enlisted U.S. Navy recruits along with other documents. Many of the photos include the full names, programs, hometowns, and the recruiter's name for recent U.S. Navy recruits. A majority of the recruits depicted in the photographs listed their hometown as "China." Associate #1 also took two additional photographs that appear to have been taken inside NRS Alhambra. The metadata for these photographs revealed a creation date of May 3, 2023, and GPS longitude/latitude coordinates that indicate the photographs were created in and around NRS Alhambra.

66.    On or around May 4, 2023, at approximately 8:01 PM PT, Paul (the individual believed to be an MSS officer as identified above) messaged YUANCE asking if they could "go shooting." Based on my training, experience, familiarity with this investigation, and review of these communications as well as other communications, I believe that "go shooting" was code for continuing their communications using online video game platforms, which I know provide communication tools for those participating in multi-player video games.

67.    Less than an hour later, on or around May 4, 2023, at approximately 8:53 PM PT, YUANCE emailed the same seven images that Associate #1 had sent to him on May 3, 2023, to an email address hosted by a PRC-based email services provider. Shortly thereafter, starting at approximately 9:05 PM PT, YUANCE transferred nine files with extension .pic to Paul. The FBI has only the names of the files, not the actual files, but I believe based on the timing of the transfer that the files that YUANCE transferred to Paul were likely the same nine images suspected to have been taken inside of NRS Alhambra by Associate #1 on May 3, 2023. I also believe that these images

AFFIDAVIT OF FBI SA JACKLYN A. ENGER

21

would have been of interest to the MSS as they identified potential Navy recruits whom the MSS could target for intelligence purposes.

5.    *In September 2023, YUANCE Communicated with a Likely MSS Intelligence Officer About Recruiting Members of the U.S. Navy to Assist the MSS*

68.    In September 2023, an individual I believe was YUANCE exchanged written messages with an individual using the moniker "Joe." I believe, based on my training, experience, and familiarity with this investigation, including the communications summarized below, that Joe was an MSS intelligence officer.

69.    Specifically, Joe and YUANCE discussed YUANCE's active involvement in the recruitment of two sources either attempting to enlist or already enlisted in the U.S. Navy on behalf of the MSS, specifically, two individuals Joe identified as "Pig Boy" and "Guangzhou Boy." Joe provided YUANCE instruction regarding potential bonuses available to be paid to these individuals, preferred Naval job assignments for potential recruits, and methods for minimizing YUANCE's risk of exposure, among other topics.

70.    For example, in reference to the individual identified as "Pig Boy," Joe wrote to YUANCE: "About the numbers, we need to take one step at a time and can't just promise the prices right at the beginning (normally, the boss doesn't let the falcon loose until he sees the hare). For example, for the sign-on payment, we can promise 10,000 to 15,000, but it needs to cover the time that he's in training . . . and he needs to tell you some specifics about his training, such as what specific positions of the intelligence analyst type he can apply for." Joe also explained that "[t]he leaders still feel good about the position that he wanted to apply for before. See if he can do it through his work . . . or there's another position called yeoman. . . . The leaders feel that these are quite good." Joe also wrote to YUANCE regarding four specific job positions: "intelligence specialist B600[;] information systems technician B460[;] mass communication specialist B610[; and] yeoman B750."

71.    Joe also wrote regarding means to minimize YUANCE and "Pig Boy's" potential risk of being exposed, stating, "don't say again that your money comes from a boss in Mainland China.

1    . . . He doesn't need to worry about what the specifics will be later on. It's necessary to make sure

2    that he doesn't form a mindset about this, so he won't fail some of the psychological tests if he

3    continues to do this. Also, this is to ensure your safety." Joe specifically asked: "Can you see if

4    there's a way to ask . . . (it'd be best to ask through a white man or someone else) whether [pig emoji]

5    . . . will need a polygraph . . . ? Because . . . the leaders are afraid that if he needs to do a polygraph,

6    he may not pass."

7

8          6.    *Since 2022, YUANCE Has Also Provided Information to the MSS About Navy Employee #1.*

9        72.    Navy Employee #1, an individual whose identity is known to me, is, and was in 2022,

10   an employee of the U.S. Navy. I believe based on my training, experience, and familiarity with this

11   investigation, including facts further detailed below, that YUANCE has likely been spotting and

12   assessing Navy Employee #1 and providing this information to the MSS for the MSS to determine

13   whether they could attempt to use or recruit Navy Employee #1 for intelligence gathering purposes

14   since 2022.

15       73.    On or about April 24, 2022, YUANCE then sent LAI the name Navy Employee #1.

16   YUANCE then wrote to LAI, "I found out. His mother is Chinese. His father and mother did not get

17   along and the mother was given custody when he was 8 years old. That is why he uses his mother's

18   last name."

19       74.    On or about October 12, 2022, LAI sent YUANCE a message stating, "Home

20   Address" followed by a specific address in San Diego, California. This address matched the address

21   of Navy Employee #1 at the time.

22       75.    In early March 2024, YUANCE, using the alias "Chingy Chan," posted publicly on a

23   social media page of Navy Employee #1. The "Chingy Chan" social media account is associated

24   with YUANCE's phone number ending in -8388. The following messages were in Chinese and have

25   been preliminarily translated by an FBI certified linguist:

26       YUANCE:                [You] don't have to go on the ship?

27       Navy Employee #1:        [I] have to.

28

| | | |
|---|---|---|
| 1 | YUANCE: | How often do you have to go? |
| 2 | Navy Employee #1: | Every day. |
| 3 | YUANCE: | [I thought] logistic people do not have to go out to sea? |

76.     From on or about January 3, 2025, to on or about January 5, 2025, YUANCE and Associate #1 traveled to San Diego, California, where they met with Navy Employee #1.  On January 5, 2025, Associate #1 took several photographs. One photograph, depicted below, appeared to be an escort badge with an emblem that reads, "Shall Not Perish" and "USS Abraham Lincoln."[12]



77.     The other photographs include different combinations of YUANCE, Associate #1, Navy Employee #1, and Navy Employee #2, whose identity is known to me, on the deck of what appears to be the USS Abraham Lincoln.  The below image depicts YUANCE, Associate #1, and

---

[12] According to U.S. Naval Institute News, the USS Abraham Lincoln, a Nimitz-class nuclear aircraft carrier, arrived at Naval Air Station North Island in San Diego Bay on December 20, 2024, wrapping a five-month deployment that included operations in the Pacific.

Navy Employee #1 holding a minor child. Based on these images, I believe that YUANCE and Associate #1 toured the USS Abraham Lincoln with Navy Employee #1 and Navy Employee #2.



78.    On or about January 5, 2025, a contact card for the name of Navy Employee #1 with a phone number ending in -1833 was updated in YUANCE's contacts. According to cellular telephone records, Navy Employee #1 has an active account for this phone number. The records show that on January 4, 2025, YUANCE called Navy Employee #1 using the -8388 number associated with YUANCE's "Chingy Chan" social media account, referenced above. YUANCE called Navy Employee #1 one time and Navy Employee #1 called YUANCE three times. The next day on January 5, 2025, Navy Employee #1 called YUANCE three times and YUANCE called Navy Employee #1 one time.

79.    On or about January 18, 2025, a social media platform sent a message to YUANCE: "... [Navy Employee #1] reacted to your photo: 'Nice trip.'" Based on the date of this notification, I believe this is in reference to the trip to San Diego.

80.    On or about January 23, 2025, at approximately 10:05 PM PT, YUANCE asked Associate #1, to send him a video and a photo. At approximately 10:16 PM PT, Associate #1 sent

1  YUANCE one audio file with the filename referencing the name of a restaurant located

2  approximately two miles from NRS Alhambra (hereinafter "Location C") entitled "[Location C]

3  2.m4a" and three photographs.  In the recording, YUANCE sought advice about the Navy from an

4  unidentified male, who told YUANCE that he worked in logistics for the Navy and was stationed in

5  San Diego.  One of the three photographs that Associate #1 sent to YUANCE is of two men sitting in

6  a restaurant, one of whom appears to be YUANCE.  Based on metadata associated with this image

7  and open-source research, this photograph appears to have been taken in a restaurant in San Diego,

8  California, on January 3, 2025.  The other two photographs sent by Associate #1 to YUANCE are of

9  YUANCE and Navy Employee #1 during the January 5, 2025, tour of the USS Abraham Lincoln.

10  YUANCE then asked Associate #1 about the group photograph with the "one guy" they met.

11  Associate #1 responded at approximately 10:23 PM PT by sending YUANCE five more photographs

12  and one more video.  All of these photographs and the video (which is approximately 12 seconds long

13  and appears to show a 360-degree view of the USS Abraham Lincoln), were taken during YUANCE

14  and Associate #1's January 5, 2025 tour of the USS Abraham Lincoln with Navy Employee #1.

15  These five photographs all depict YUANCE, Navy Employee #1, and Navy Employee #2, and in

16  three photographs, also include a minor child held by Navy Employee #1.

17      81.    From approximately 10:33 PM PT to 10:39 PM PT, shortly after receiving the files

18  from Associate #1 sent above, YUANCE appears to have sent Paul eight separate messages.  In the

19  version of the messages between YUANCE and Paul that the FBI has access to at this time, these

20  eight entries revealed that YUANCE "recalled a message," which I believe indicates that YUANCE

21  sent Paul eight messages but then deleted the contents of these messages.  Based on my training,

22  experience, and familiarity with this investigation, I believe that in these messages, YUANCE likely

23  transferred to Paul some of the images and videos that Associate #1 sent him of YUANCE at a

24  restaurant with an unknown male and of YUANCE touring the USS Abraham Lincoln with Navy

25  Employee #1 and Navy Employee #2.  I know based on my training, experience, and familiarity with

26  this investigation that the MSS has asked their co-optees to record conversations with potential MSS

27  assets and then transmit these recordings back to the MSS.  Based on my training, experience, and

28

AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                              26

1  familiarity with this investigation, I believe that the audio file referencing Location C may have been

2  such a recording.

3       82.    On February 8, 2025, YUANCE, Associate #1, and their minor children traveled from

4  Portland, Oregon to the PRC.  They remained in the PRC until April 3, 2025, when they returned to

5  the United States.  While in the PRC, YUANCE communicated with Paul. These messages were in

6  Chinese and a preliminary summary translation of them has been prepared by an FBI certified

7  linguist.

8       83.    For example, on February 12, 2025, YUANCE and Paul communicated about meeting

9  the next day at a location in Zhaoqing, Guangdong Province, PRC.  Paul instructed YUANCE to

10  think over what was discussed with "Guangzhou Boy," told him it was best to write it down, and that

11  they could go through it in detail when they met the following day.  Later text messages confirm that

12  Paul and YUANCE met in person on February 13, 2025.  I believe based on my training, experience,

13  and familiarity with this investigation that "Guangzhou Boy" was likely a reference to the same

14  individual discussed in YUANCE's communications with Joe in September 2023, described in

15  Paragraph 69 above, and may be a reference to Navy Employee #1, who was born in Guangzhou,

16  Guangdong Province, PRC.  I know based on my training, experience, and familiarity with this

17  investigation that the MSS is constantly looking for new and valuable information about the United

18  States military.

19       84.    On February 26, 2025, Paul wrote to YUANCE and asked whether he had talked to

20  Guangzhou Boy about meeting a "boss who does military trade."  YUANCE responded that he had

21  not.  Paul responded that they had been arranging something for Guangzhou Boy and that Paul would

22  tell YUANCE about it when they meet.  On March 2, 2025, Paul again raised with YUANCE the

23  need for YUANCE to talk to Guangzhou Boy.  Paul told YUANCE that he was under a lot of

24  pressure, and to report the results directly back to him.  Paul and YUANCE discussed another in-

25  person meeting, and Paul instructed YUANCE to follow up with Guangzhou Boy beforehand.  On

26  March 5, 2025, YUANCE and Paul planned a meeting for the following day, and YUANCE

27  confirmed that he had talked to Guangzhou Boy.  I believe based on my training, experience, and

28

AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                          27

familiarity with this investigation that Paul was encouraging YUANCE to develop and/or continue using Guangzhou Boy, potentially Navy Employee #1, as an asset for the MSS.

85.     On March 30, 2025, Paul and YUANCE discussed meeting a final time before YUANCE's return to the United States. Paul instructed YUANCE that they should meet on April 2, 2025, and that Paul would pass YUANCE questions for YUANCE to ask an unidentified individual upon YUANCE's return to the United States. On April 1, 2025, Paul again told YUANCE that he would give YUANCE questions to bring back to the United States to ask an unidentified individual, possibly a different person than referred to in Paul's March 30, 2025 message. Based on my training, experience, and familiarity with this investigation, I believe that the MSS planned to provide questions to YUANCE in-person to take back to the United States to use to either evaluate one or more potential MSS assets, the identities of whom are unknown to me, or to provide guidance to an MSS asset about acquiring U.S. intelligence.

86.     Based on the foregoing, as well as my training, experience, and familiarity with this matter, I believe that YUANCE communicated with Navy Employee #1 at the MSS's direction in order to gather intelligence for the MSS and to establish a relationship with Navy Employee #1 to assess whether Navy Employee #1 could be used or recruited by the MSS for intelligence gathering purposes. I also believe that the MSS, through Paul, later directed YUANCE to continue to evaluate potential MSS assets, including Guangzhou Boy, and that Guangzhou Boy could be a reference to Navy Employee #1.

G.     IN APRIL AND MAY 2024, YUANCE AND ASSOCIATE #1 MET IN THE PRC WITH THE MSS AND ARRANGED YUANCE'S ONGOING SALARY PAYMENTS FROM THE MSS

87.     From March 20, 2024 to May 16, 2024, YUANCE and Associate #1 traveled to the PRC with their minor children. During this two-month trip, YUANCE communicated regularly with Paul, the individual identified in Paragraph 63 above.

88.     On or about April 1, 2024, Paul and YUANCE communicated about an anticipated meeting the following week in the PRC with an individual identified as "the boss" and "the leader,"

1   who, based on my training, experience, and familiarity with this investigation, I believe to be a more

2   senior MSS intelligence officer.

3        89.    Their conversation is below and is shown in China Standard Time:

| Date/Time (CST) | Sender | Message |
|---|---|---|
| 4/1/24 10:33 PM | YUANCE | Next week there will be some free time. |
| 4/1/24 10:34 PM | Paul | Can we meet on the 7th? |
| 4/1/24 10:34 PM | YUANCE | Yes. |
| 4/1/24 10:34 PM | Paul | Ok let's shoot for that day then. |
| 4/1/24 10:34 PM | YUANCE | Ok 👍 |
| 4/1/24 10:37 PM | Paul | What's originally planned was for you to meet the boss tomorrow, at the meantime "cam" the cost [Lol] |
| 4/1/24 10:39 PM | Paul | If we cancel with the leader last minute after it's arranged, it's troublesome next time. And bro, I am in an awkward situation too [emoji: Lol] |
| 4/1/24 10:40 PM | YUANCE | Now even I just step out of the house I have to be accompanied by her, so miserable |
| 4/1/24 10:40 PM | Paul | What about the 7th? |
| 4/1/24 10:41 PM | YUANCE | If I talk to her before hand it will be ok. |
| 4/1/24 10:43 PM | Paul | Ok, so tomorrow is truly not possible? |
| 4/1/24 10:44 PM | Paul | The thing is the leader has been asking, saying that she has not seen you after you have returned for many days. She rescheduled other work for the appointment with you today.  Very hard on me to maneuver, boss. Please understand that [Lol]. |

90.    On or about April 6, 2024, Paul and YUANCE continued to communicate regarding

the upcoming meeting and arranging a place for YUANCE and Associate #1 to stay near the area of

the meeting in Guangzhou.  Paul told YUANCE, "Let us book a room for you.  We will pay for you

guys," and then gave YUANCE instructions to the specific hotel located in Guangzhou, Guangdong

Province, PRC where YUANCE previously told LAI he was staying during the January 12, 2022

dead drop, referenced in Paragraph 33 above.  I believe based on my training, experience, and

familiarity with this investigation that Paul told YUANCE that the MSS would book and pay for

YUANCE and Associate #1's hotel room.

91.     On or about April 8, 2024, YUANCE and Paul further communicated about the meeting scheduled for that day with MSS OFFICER 1, who I believe to be the "leader" referenced by Paul in the above-quoted exchanges.  Paul told YUANCE that it would be "a quick meet up."  Based on my review of these communications, I believe that YUANCE and Associate #1 met with MSS OFFICER 1 and Paul on this day.

92.     On or about April 29, 2024, Paul and YUANCE communicated about another meeting scheduled for that day involving YUANCE, Associate #1, Paul, and MSS OFFICER 1 during which the MSS planned to provide Associate #1 payment for YUANCE's services and discuss YUANCE's salary.  Their conversation is below and is shown in China Standard Time:

| Date/Time (CST) | Sender | Message |
|---|---|---|
| 4/29/24 10:00 AM | Paul | You call the shots. Anyway today we won't talk about work as your wife is here.  Mainly to mend the relationship with your wife. Also do we talk to her about salary today?  How much should we say? |
| 4/29/24 10:01 AM | YUANCE | Just be truthful. |
| 4/29/24 10:11 AM | YUANCE | Actually if she doesn't have questions better not talking [Lol] |
| 4/29/24 10:15 AM | Paul | I am worried she thinks you are working for us for free again [Lol] |
| 4/29/24 10:16 AM | Paul | If she thinks that, it is not helpful when we contact you in time of need. |
| 4/29/24 10:17 AM | Paul | You solve this problem. We don't mind [emoji: melt in to smile] our biggest worry is it is inconvenient to contact you. |
| 4/29/24 12:10 PM | YUANCE | Did you bring money with you [emoji: Lol]  I told her I have money today to give to her |
| 4/29/24 12:10 PM | Paul | Ok, see you in a bit. |
| 4/29/24 12:33 PM | Paul | Chief [MSS OFFICER 1's surname] was suddenly called out to a meeting in the morning.  She said we should leave it to her to hand it to your wife in person. |
| 4/29/24 12:35 PM | Paul | So we have to wait for the next time.  Anyway it will be handed to your wife before you guys leave.  Today let us check the state of your wife, and then hear the updates of the house in Jiangmen. |

93.    I believe based on my training, experience, and familiarity with this investigation that Paul and YUANCE had arranged a meeting among MSS OFFICER 1, Associate #1 and themselves. Based on the context of this discussion, I believe that Paul indicated that YUANCE was being paid by the MSS but was concerned that Associate #1 thought that YUANCE was working for the MSS for free, as Paul stated, "I am worried she thinks you are working for us for free again." Later in the exchange, Paul advised YUANCE to explain to Associate #1 that he would be receiving a salary from Paul's "company" (presumed to be the MSS) for future work: "You just say initially there was no salary, it was just separate sideline work. Now salary would only come when it might involve a relatively long and fixed collaboration with our company in the future. And that is why we ask your wife to open a bank card. You can do the explanation! On our end, this is what Chief [MSS OFFICER 1's surname] has emphasized."

94.    On or about May 9, 2024, YUANCE and Paul arranged for another meeting to occur on or about May 10, 2024, in which MSS OFFICER 1, Paul, and a third individual also assessed to be an MSS intelligence officer whose identity is known to me, referred to herein as "MSS OFFICER 2", would take YUANCE and Associate #1 out for a meal. Paul and YUANCE discussed providing payment to Associate #1 in advance of that meeting in the form of cash and then subsequently make a wire transfer to Associate #1. Specifically, Paul told YUANCE, "Give three thousand first. When we meet, [MSS OFFICER 2] will ask your wife in person for the bank card number, and then wire transfer it to her after some days. Is that ok?" I believe based on the prior conversations that this was likely meant to serve as YUANCE's salary from the MSS, filtered through Associate #1's bank account. YUANCE responded that he understood and "need[ed] to make it clear with her." Later in their conversation, still on May 9, 2024, Paul asked YUANCE, "regarding ⑤, do you want us to hand it to your wife? Or would it work to give it to you, you give it to your wife?," which I believe based on the context of this discussion was Paul asking whether the MSS should give a payment directly to Associate #1 or whether they should give it to YUANCE, who would then give it to Associate #1. YUANCE responded, "Give it to him and then let her wander around by herself, do you think that is ok?", which I believe to have been YUANCE indicating that the MSS should hand

1   Associate #1 the cash payment. Paul later replied, "we will hand the ⑤ to your wife," by which I

2   believe Paul was confirming that the MSS would make a direct cash payment to Associate #1.

3       H.    LAI'S RECENT TRAVEL TO THE UNITED STATES

4       95.    Prior to LAI's current trip to the United States, LAI had last visited the United States

5   in 2023, arriving in March 2023 and departing in May 2023. During that trip, LAI identified

6   YUANCE as his point of contact and YUANCE's business for his address in his U.S. visa

7   information (suggesting a legitimate business purpose for the trip to authorities), despite LAI's other

8   activities during that trip as described above.

9       96.    On April 1, 2025, LAI traveled again to the United States from overseas. He arrived

10  at George Bush Intercontinental Airport ("IAH") in Houston, Texas onboard EVA Airways 52 from

11  Taipei, Taiwan with one carry-on luggage and one checked luggage. Upon arrival, LAI presented a

12  PRC passport and stated to U.S. Customs and Border Protection ("CBP"), with the assistance of a

13  Chinese language translator, that he was an "[Online retailer] seller" and the purpose of his visit was

14  for business and he would be staying for a period of two weeks. He also stated he would not be

15  leaving the Houston area.

16      97.    Although LAI reported to CBP that he would be staying during his visit for two

17  weeks, he has instead stayed in the United States for more than two months as of the current date.

18      98.    LAI also reported to CBP that he would not be leaving the Houston area during this

19  trip, but he in fact left the Houston area on or about May 9, 2025—apparently driving to Southern

20  California and returning to Texas on or around May 15, 2025. According to FBI physical

21  surveillance, LAI placed a suitcase in the trunk of a silver vehicle with a license plate number known

22  to me, and departed the Houston area, heading west towards San Antonio with an identified male,

23  whose identity is known to me, on the afternoon of May 9, 2025. According to license plate reader

24  data, the vehicle continued traveling west from Kingsbury, Texas through New Mexico on May 10,

25  2025, before being identified traveling west bound on I-10 in Tucson, Arizona on May 10, 2025, at

26  approximately 11:26 AM. License plate reader data later identified the vehicle in Ontario, California

27  on May 11, 2025 and in El Monte, California on May 12, 2025.

28

99.    Sometime after May 12, 2025, I believe LAI embarked upon a return trip to Houston, Texas.  On May 14, 2025, license plate reader data identified the vehicle in Tucson, Arizona.  Later that day, the vehicle was observed traveling southbound on I-10 in Mesquite, New Mexico.  On May 15, 2025, license plate reader data observed the vehicle in Junction, Texas.

100.    I believe that LAI's travel between Houston and Southern California was inconsistent with the information he provided to CBP when he arrived in the United States.  I also believe LAI could have been tasked to travel west by the MSS for intelligence purposes.  Of note, Navy Employee #1 has been and continues to be stationed in Southern California.

## V.    CONCLUSION

101.    Based on the foregoing, there is probable cause to believe that Yuance Chen ("YUANCE") and Liren "Ryan" Lai ("LAI") acted in the United States as agents of the Government of the People's Republic of China without prior notification to the Attorney General, as required by law, in violation of 18 U.S.C. § 951.  Accordingly, I request that the Court issue the attached Criminal Complaint and Arrest Warrants.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Jacklyn A. Enger
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed via telephone pursuant to Fed. R. Crim. P. 4.1 this 26th day of June, 2025.

THE HONORABLE ALEX G. TSE
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT OF FBI SA JACKLYN A. ENGER                                                                      33